1

2

3

4

5

6          UNITED STATES DISTRICT COURT

7          NORTHERN DISTRICT OF CALIFORNIA

8

9   SAMUEL RAY HANEY,                          No. C 05-5060 MHP (pr)

10          Petitioner,                        **ORDER DENYING HABEAS
                                               PETITION**
11      v.

12   A. P. KANE, warden,

13          Respondent.
                                          /
14

15                              **INTRODUCTION**

16      Samuel Ray Haney, a prisoner at the Correctional Training Facility in Soledad, filed

17   this pro se action seeking a writ of habeas corpus under 28 U.S.C. § 2254.  This matter is

18   now before the court for consideration of the merits of the pro se habeas petition.  For the

19   reasons discussed below, the petition will be denied.

20                              **BACKGROUND**

21      Samuel Ray Haney was convicted in Alameda County Superior Court of second

22   degree murder and was found to have used a firearm in the commission of the offense.  He

23   was sentenced to a term of 15 years to life plus 2 years imprisonment in 1986.  His habeas

24   petition does not concern that conviction directly, but instead focuses on a July 21, 2004

25   decision by a panel of the Board of Prison Terms (now known as the Board of Parole

26   Hearings ("BPH")) finding him not suitable for parole.

27

28

**United States District Court**
For the Northern District of California

1    The BPH identified several factors in support of its determination that Haney was not

2  suitable for parole and would pose an unreasonable risk of danger to society or a threat to

3  public safety if he was released.  The factors identified included the circumstances of the

4  murder, his escalating criminality and violence before the commitment offense, his very

5  limited programming in prison and his disciplinary record in prison.   The specifics regarding

6  the crime and the circumstances supporting the finding of unsuitability are described in the

7  Discussion section later in this order.

8    Haney sought relief in the California courts.  The Alameda County Superior Court

9  denied his petition for writ of habeas corpus in 2004 in a reasoned order.  Resp. Exh. D.  The

10  California Court of Appeal summarily denied his petition for writ of habeas corpus and the

11  California Supreme Court summarily denied his petition for review.  Resp. Exhs. E and F.

12    Haney then filed his federal petition for writ of habeas corpus.  The court construed

13  Haney's federal petition for writ of habeas corpus to allege two claims:  (1) his right to due

14  process was violated because there was not sufficient evidence to support the BPH's decision

15  and (2) his right to due process was violated because the BPH and Governor have an anti-

16  parole bias in considering inmates for parole.  Respondent filed an answer.  Petitioner did not

17  file a traverse.  The matter is now ready for a decision on the merits.

18  **JURISDICTION AND VENUE**

19    This court has subject matter jurisdiction over this habeas action for relief under 28

20  U.S.C. § 2254.  28 U.S.C. § 1331.  This action is in the proper venue because Haney is in

21  custody and the challenged action occurred at the Correctional Training Facility in Soledad.

22  Soledad is in Monterey County, California, within this judicial district.  28 U.S.C. §§ 84,

23  2241(d).

24  **EXHAUSTION**

25    Prisoners in state custody who wish to challenge collaterally in federal habeas

26  proceedings either the fact or length of their confinement are required first to exhaust state

27  judicial remedies, either on direct appeal or through collateral proceedings, by presenting the

28  highest state court available with a fair opportunity to rule on the merits of each and every

1   claim they seek to raise in federal court.  See 28 U.S.C. § 2254(b), (c).  The parties do not

2   dispute that state court remedies were exhausted for the claims asserted in the petition.

3                                            **STANDARD OF REVIEW**

4          This court may entertain a petition for writ of habeas corpus "in behalf of a person in

5   custody pursuant to the judgment of a State court only on the ground that he is in custody in

6   violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

7   The petition may not be granted with respect to any claim that was adjudicated on the merits

8   in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that

9   was contrary to, or involved an unreasonable application of, clearly established Federal law,

10  as determined by the Supreme Court of the United States; or (2) resulted in a decision that

11  was based on an unreasonable determination of the facts in light of the evidence presented in

12  the State court proceeding."  28 U.S.C. § 2254(d); see Williams (Terry) v. Taylor, 529 U.S.

13  362, 409-13 (2000).   Section 2254(d) applies to a habeas petition from a state prisoner

14  challenging the denial of parole.  See Sass v. California Board of Prison Terms, 461 F.3d

15  1123, 1126-27 (9th Cir. 2006).

16                                               **DISCUSSION**

17  A.       Sufficiency Of Evidence Claim

18          1.       Due Process Requires That Some Evidence Support A Parole Denial

19          A California prisoner with a sentence of a term of years to life with the possibility of

20  parole has a protected liberty interest in release on parole and therefore a right to due process

21  in the parole suitability  proceedings.  See Sass, 461 F.3d at 1127-28; Board of Pardons v.

22  Allen, 482 U.S. 369 (1987); Greenholtz v. Inmates of Nebraska Penal & Corr. Complex, 442

23  U.S. 1 (1979); Cal. Penal Code § 3041(b).

24          A parole board's decision satisfies the requirements of due process if "some evidence"

25  supports the decision.  Sass, 461 F.3d at 1128-29 (adopting some evidence standard for

26  disciplinary hearings outlined in Superintendent v. Hill, 472 U.S. 445, 454-55 (1985)).  "To

27  determine whether the some evidence standard is met 'does not require examination of the

28  entire record, independent assessment of the credibility of witnesses, or weighing of the

                                                         3

1 evidence.  Instead, the relevant question is whether there is any evidence in the record that

2 could support the conclusion reached'" by the parole board.  Id. at 1128 (quoting

3 Superintendent v. Hill, 472 U.S. at 455-56).  The "some evidence standard is minimal, and

4 assures that 'the record is not so devoid of evidence that the findings of the . . . board were

5 without support or otherwise arbitrary.'"  Id. at 1129 (quoting Superintendent v. Hill, 472

6 U.S. at 457).  The some evidence standard of Superintendent v. Hill is clearly established law

7 in the parole context for purposes of § 2254(d).  Sass, 461 F.3d at 1129.

8          A critical issue in parole denial cases concerns the BPH's use of evidence about the

9 murder that led to the conviction.  Three Ninth Circuit cases provide the guideposts for

10 applying the Superintendent v. Hill some evidence standard on this point: Biggs v. Terhune,

11 334 F.3d 910 (9th Cir. 2003), Sass, 461 F.3d 1123, and Irons v. Carey, 479 F.3d 658 (9th Cir.

12 2007).  Biggs explained that the value of the criminal offense fades over time as a predictor

13 of parole suitability:  "The Parole Board's decision is one of 'equity' and requires a careful

14 balancing and assessment of the factors considered. . . .  A continued reliance in the future on

15 an unchanging factor, the circumstance of the offense and conduct prior to imprisonment,

16 runs contrary to the rehabilitative goals espoused by the prison system and could result in a

17 due process violation."  Biggs, 334 F.3d at 916-17.  Biggs upheld the initial denial of a parole

18 release date based solely on the nature of the crime and the prisoner's conduct before

19 incarceration, but cautioned that "[o]ver time . . . , should Biggs continue to demonstrate

20 exemplary behavior and evidence of rehabilitation, denying him a parole date simply because

21 of the nature of Biggs' offense and prior conduct would raise serious questions involving his

22 liberty interest in parole."  Id. at 916.  Next came Sass, which criticized the Biggs statements

23 as improper and beyond the scope of the dispute before the court:  "Under AEDPA it is not

24 our function to speculate about how future parole hearings could proceed."  Sass, 461 F.3d at

25 1129.  Sass determined that the parole board is not precluded from relying on unchanging

26 factors such as the circumstances of the commitment offense or the parole applicant's pre-

27 offense behavior in determining parole suitability.  See id. at 1129 (commitment offenses in

28 combination with prior offenses provided some evidence to support denial of parole at

4

1   subsequent parole consideration hearing).  Recently, <u>Irons</u> determined that due process was

2   not violated by the use of the commitment offense and pre-offense criminality to deny parole

3   for a prisoner 16 years into his 17-to-life sentence.  <u>Irons</u> emphasized that all three cases

4   (<u>Irons</u>, <u>Sass</u> and <u>Biggs</u>) in which the court had "held that a parole board's decision to deem a

5   prisoner unsuitable for parole solely on the basis of his commitment offense comports with

6   due process, the decision was made before the inmate had served the minimum number of

7   years required by his sentence."  <u>Irons</u>, 479 F.3d at 665; <u>see e.g., id.</u> at 660 (inmate in 16th

8   actual year of his 17-to-life sentence).

9           The message of these three cases is that the BPH can look at immutable events, such

10  as the nature of the conviction offense and pre-conviction criminality, to predict that the

11  prisoner is not currently suitable for parole even after the initial denial (<u>Sass</u>), but the weight

12  to be attributed to those immutable events should decrease over time as a predictor of future

13  dangerousness as the years pass and the prisoner demonstrates favorable behavior (<u>Biggs</u> and

14  <u>Irons</u>).  <u>Sass</u> did not dispute the principle that, other things being equal, a murder committed

15  50 years ago is less probative of a prisoner's current dangerousness than one committed 10

16  years ago.  Not only does the passage of time in prison count for something, exemplary

17  behavior and rehabilitation in prison count for something according to <u>Biggs</u> and <u>Irons</u>.

18  <u>Superintendent v. Hill</u>'s standard might be quite low, but it does require that the decision <u>not</u>

19  be arbitrary, and reliance on only the facts of the crime might eventually make for an

20  arbitrary decision.

21          Having determined that there is a due process right, and that some evidence is the

22  evidentiary standard for judicial review, the next step is to look to state law because that sets

23  the criteria to which the some evidence standard applies.  One must look to state law to

24  answer the question, "'some evidence' of what?"

25          2.      State Law Standards For Parole For Murderers In California

26  California uses indeterminate sentences for most non-capital murderers, with the term

27  being life imprisonment and parole eligibility after a certain minimum number of years.  A

28  first degree murder conviction yields a base term of 25 years to life and a second degree

5

1   murder conviction yields a base term of 15 years to life imprisonment.  See In re

2   Dannenberg, 34 Cal. 4th 1061, 1078 (Cal.), cert. denied, 126 S. Ct. 92 (2005); Cal. Penal

3   Code § 190.   The upshot of California's parole scheme described below is that a release date

4   normally must be set unless various factors exist, but the "unless" qualifier is substantial.

5          A BPH panel meets with an inmate one year before the prisoner's minimum eligible

6   release date "and shall normally set a parole release date. . . . The release date shall be set in a

7   manner that will provide uniform terms for offenses of similar gravity and magnitude in

8   respect to their threat to the public, and that will comply with the sentencing rules that the

9   Judicial Council may issue and any sentencing information relevant to the setting of parole

10  release dates."  Cal. Penal Code § 3041(a).  Significantly, that statute also provides that the

11  panel "shall set a release date unless it determines that the gravity of the current convicted

12  offense or offenses, or the timing and gravity of current or past convicted offense or offenses,

13  is such that consideration of the public safety requires a more lengthy period of incarceration

14  for this individual, and that a parole date, therefore, cannot be fixed at this meeting."  Cal.

15  Penal Code § 3041(b).

16         One of the implementing regulations, 15 Cal. Code Regs. § 2401, provides:  "A parole

17  date shall be denied if the prisoner is found unsuitable for parole under Section 2402(c).  A

18  parole date shall be set if the prisoner is found suitable for parole under Section 2402(d).  A

19  parole date set under this article shall be set in a manner that provides uniform terms for

20  offenses of similar gravity and magnitude with respect to the threat to the public."[1]  The

21  regulation also provides that "[t]he panel shall first determine whether the life prisoner is

22  suitable for release on parole.  Regardless of the length of time served, a life prisoner shall be

23  found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose

24  an unreasonable risk of danger to society if released from prison." 15 Cal. Code Regs. §

25  2402(a).  The panel may consider all relevant and reliable information available to it.  15 Cal.

26  Code Regs. § 2402(b).

27         The regulations contain a matrix of suggested base terms for several categories of

28  crimes.  See 15 Cal. Code Regs. § 2403.  For example, for second degree murders, the matrix

1  of base terms ranges from the low of 15, 16, or 17 years to a high of 19, 20, or 21 years,

2  depending on some of the facts of the crime.   Some prisoners estimate their time to serve

3  based only on the matrix.   However, going straight to the matrix to calculate the sentence

4  puts the cart before the horse because it ignores critical language in the relevant statute and

5  regulations that requires the prisoner first to be found suitable for parole.

6       The statutory scheme places individual suitability for parole above a prisoner's

7  expectancy in early setting of a fixed date designed to ensure term uniformity.  Dannenberg,

8  34 Cal. 4th at 1070-71.  Under state law, the matrix is not reached unless and until the

9  prisoner is found suitable for parole.  Id. at 1070-71; 15 Cal. Code Regs. § 2403(a) ("[t]he

10  panel shall set a base term for each life prisoner who is found suitable for parole").  The

11  California Supreme Court's determination of state law in Dannenberg is binding in this

12  federal habeas action.  See Hicks v. Feiock, 485 U.S. 624, 629-30 (1988).

13       The California Supreme Court also has determined that the facts of the crime can

14  alone support a sentence longer than the statutory minimum even if everything else about the

15  prisoner is laudable.  "While the Board must point to factors beyond the minimum elements

16  of the crime for which the inmate was committed, it need engage in no further comparative

17  analysis before concluding that the particular facts of the offense make it unsafe, at that time,

18  to fix a date for the prisoner's release."  Dannenberg, 34 Cal. 4th at 1071; see also In re

19  Rosenkrantz, 29 Cal. 4th 616, 682-83 (Cal. 2002), cert. denied, 538 U.S. 980 (2003) ("[t]he

20  nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole"

21  but might violate due process "where no circumstances of the offense reasonably could be

22  considered more aggravated or violent than the minimum necessary to sustain a conviction

23  for that offense").

24       3.    Some Evidence Supports The BPH's Decision In Haney's Case

25       The BPH identified several factors supporting its decision to find Haney unsuitable

26  for parole, i.e., the circumstances of the murder, his escalating criminality and violence

27  before the commitment offense, his very limited programming in prison and his disciplinary

28  record in prison.  The Alameda County Superior Court upheld the decision in a reasoned

7

1   order.  See Resp. Exh. D.  That court stated that some evidence had to support the decision

2   and found that some evidence did support the decision: "The record presented to this court

3   demonstrates that there was certainly some evidence, including but not limited to the

4   committing offense, Petitioner's disciplinary record, and Petitioner's participation in

5   rehabilitation programs, to support the Board's decision.  There is nothing in the record that

6   indicates that the Board's decision was arbitrary or capricious, nor that Petitioner's equal

7   protection or due process rights were violated."  See id. at 1.  Because the Alameda County

8   Superior Court's decision is the last reasoned decision, that is the decision to which § 2254(d)

9   applies.  See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d

10  1085, 1091-92 (9th Cir. 2005), cert. denied, 126 S. Ct. 2041 (2006).

11              a.      Commitment Offense

12      The facts of the crime were described in the life prisoner evaluation report:

13      On August 28, [1984], Elaine Haney was shot four times by her estranged husband,
        Samuel Haney in her parents' Oakland, California home.  At the time of the shooting,
14      Elaine and Samuel were not living together.  Elaine and her five month old daughter,
        Samantha were living with Elaine's parents.  On the day of the shooting, Samuel
15      Haney had come to visit Elaine and Samantha.  Elaine's two sisters were also living in
        the Oakland residence and were in the house when Samuel arrived.  Elaine's sisters,
16      Amy and Anessa, were playing in an upstairs bedroom at the time of the shooting.
        They reported that after his arrival, Haney came upstairs and took Samantha from
17      Amy and returned downstairs.  At some point, either before or after obtaining
        Samantha, the prisoner went into another upstairs bedroom and took a loaded .38
18      caliber revolver from his father-in-law's bedroom nightstand.  Amy reported that she
        and Anessa heard shots about five minutes after Haney went downstairs with the
19      baby.  After hearing the gunshots, the girls climbed out of a window and hid in the
        backyard.  Later they walked around to the front of the house and went into the living
20      room.  Samuel Haney was gone and their sister, Elaine was lying on the floor in a pool
        of blood.  Lying on the floor next to her was the baby, Samantha.  It was later
21      established that Elaine has been shot in the head, shoulder, back and vagina.  Police
        determined that she was holding the infant when she was shot.  After Haney shot his
22      wife, he fled the house carrying the gun.  The gun was never recovered.

23  Resp. Exh. B, p. 1.

24      A circumstance tending to indicate unsuitability for parole is that "the prisoner

25  committed the offense in an especially heinous, atrocious or cruel manner."  15 Cal. Code

26  Regs. § 2402(c)(1).  The factors to be considered in determining whether that circumstance

27  exists are that there were multiple victims, "[t]he offense was carried out in a dispassionate

28  and calculated manner, such as an execution-style murder," "[t]he victim was abused, defiled

8

1   or mutilated during or after the offense," "[t]he offense was carried out in a manner which

2   demonstrates an exceptionally callous disregard for human suffering," and "[t]he motive for

3   the crime is inexplicable or very trivial in relation to the offense."  15 Cal. Code Regs. §

4   2402(c)(1).  The BPH considered a circumstance proper under California law.

5        The BPH considered the circumstances of the murder and concluded that it was "a

6   very callous offense.  There were certainly multiple victims involved in that Samantha could

7   easily have been harmed."  RT 60; <u>see also</u> RT 63 ("very cruel offense" and "offense was

8   carried out in a manner that demonstrated an exceptionally callous disregard for human

9   suffering.")   The BPH stated that the victim was defiled in that she was shot in the vagina.

10  RT 61.  The motive was "incredibly trivial" in relation to the offense.  RT 61.  T

11       There was sufficient evidence to support the finding that the circumstances of the

12  commitment offense tended to show unsuitability.  There was evidence that the victim was

13  shot while holding a baby.  The BPH was not required to accept as true Haney's statement

14  that the baby had fallen to the floor before he shot his estranged wife or his statement that

15  shooting his wife in the vagina must have been an accident.  Although the fact that the baby

16  was present does not appear to support a multiple victim determination because the baby was

17  not physically wounded, shooting a baby's mother while the baby is in her arms does support

18  a determination that the shooting was done with exceptionally callous disregard for human

19  suffering.  The gunshot to the vagina also supports the BPH's determination that the victim

20  was defiled during the offense.  There also was evidentiary support for the BPH's

21  determination that the motive was trivial: Haney was upset that his wife wanted a divorce.

22  RT 11.  In sum, the evidence in the record supports a finding that the circumstances of the

23  offense indicated Haney was not yet suitable for parole and would pose an unreasonable risk

24  of danger to society if released from prison.

25              b.    <u>Escalating Criminality</u>

26       The BPH is to consider all relevant and reliable information in determining suitability

27  for parole.  The information to be considered includes the prisoner's "past criminal history,

28  including involvement in other criminal misconduct which is reliably documented."  15 Cal.

9

1  Code Regs. § 2402(b).  Among the specific circumstances listed as tending to indicate

2  unsuitability is a previous record of violence, such as if the prisoner had "on previous

3  occasions inflicted or attempted to inflict serious injury on a victim, particularly if the

4  prisoner demonstrated serious assaultive behavior at an early age."  15 Cal. Code Regs. §

5  2402(c)(2).  Another circumstance listed as tending to indicate unsuitability is the existence

6  of a previous sexual assault "in a manner calculated to inflict unusual pain or fear upon the

7  victim."  Id. at § 2402(c)(4).

8        The BPH considered circumstances proper under California law in finding that

9  Haney's escalating criminality and history of sexual assaults showed he was unsuitable for

10  parole.  Although he was only 20 years old when he murdered his estranged wife, Haney

11  already had amassed an extensive and serious criminal record as a juvenile.  At age 14, he

12  was sentenced to six years in the California Youth Authority for sexually assaulting seven

13  girls (ages 7-14) and two boys (ages 10 and 13).  RT 16; Resp. Exh. G, p. 2.  He also had

14  three convictions (or juvenile adjudications of delinquency) for grand theft as lesser-included

15  offenses to three different robberies in 1977.  He also had two escapes and a battery as a

16  juvenile.  Id. Haney had an abysmal institutional record as a juvenile: "[H]e was placed on

17  juvenile probation at the age of 13, and within 13 months was convicted of four subsequent

18  series of offenses.  His performance on probation was so bad that within two months of being

19  placed on probation, he was placed in a foster home, and within less than a month he was

20  placed in Las Vistas, a secure detention facility.  After two escapes, a robbery, and a petition

21  alleging 31 counts which resulted in a finding of five felony sex offenses, the defendant was

22  committed to the California Youth Authority at the age of 14."  Resp. Exh. G, p. 4.  He was

23  on parole from the CYA when he murdered his wife.  There was sufficient evidence to

24  support the BPH's reliance on Haney's prior criminality, sex offenses and escalating

25  criminality as tending to show that he was not suitable for parole.

26             c.      Misconduct And Limited Programming In Prison

27        The BPH found that Haney had not sufficiently participated in beneficial self-help

28  programming in prison.  There was no record of any programming since the mid-1990s

10

1   (erroneously identified as the early 1980s in the decision part of the transcript).  RT 32-34,

2   62.  Haney apparently had not worked, attended any educational programs, or done any

3   group activities since arriving at CTF in 2002.  See RT 29-30.  Haney stated that he read self-

4   help books in his cell, although apparently he had read only a few books in the last three

5   years.  RT 30-31, 36.  He had done the Alternatives to Violence and Breaking Barriers

6   programs in 1993.  RT 33. He also had been in AA, but only for 2-1/2 months.  RT 33.  He

7   had been a regular user of marijuana as a juvenile, but had never drank alcohol.  See RT 19,

8   34.  He had been involved in his religion since 1990.  RT 35.

9           The psychological reports for Haney stated that he had an antisocial personality

10  disorder that was improving, which the BPH stated "indicates a need for a longer period of

11  observation and evaluation or treatment."  See RT 64-65; Resp. Exhs. H and I.  The

12  psychological reports did not indicate a need for further therapy.  Although Haney had shot

13  his wife in the vagina and had been convicted as a juvenile for sexual assaults on 9 children,

14  the psychological report from 1999 indicated that Haney's "history of sexual aggression

15  seems to be more related to the Antisocial Personality orientation rather than psychosexual

16  disorder."  Resp. Exh. I, p. 4.  The evaluator stated that Haney had "no significant risk

17  factors" and was considered below average in comparison to other inmates if released on

18  parole.  See id. at 6.  "There is no need for further therapy or diagnostic evaluation."  Id.

19  That Haney did not need further professional treatment does not undermine the BPH's

20  determination that he had done limited programming and would benefit from further self-

21  help programming.

22          The BPH also relied on Haney's misconduct in prison to deny him parole.  He had

23  received six CDC-115 rule violation reports, including four since his last parole suitability

24  hearing in 2002.  Several of the recent CDC-115s were for his refusal to cut hair to comply

25  with grooming requirements.  (His refusal to cut his hair may have been religiously

26  motivated, but there is no indication he tried to challenge any grooming regulations on

27  religious freedom grounds and eventually did cut his hair.)  He also received a disciplinary

28  write-up on March 31, 2003 for refusing to obey written orders.  See RT 37-38.  The officer

1   "noted that [Haney] demonstrated inappropriate anger and was resistant to counseling from

2   the officer."  RT 64.  Haney also had received ten CDC-128 chronos, which were

3   memoranda reflecting that he had been counseled for minor transgressions of prison rules

4   and regulations.  The most recent CDC-128 was issued in March 2003.  <u>See</u> RT 29-30.

5          The BPH's consideration of and reliance on Haney's unfavorable conduct in prison

6   and need for further programming was not improper. Section 2402(b) specifically allows the

7   BPH to consider a great range of relevant and reliable information, such as the prisoner's

8   social history and mental state.

9                          d.          <u>There Was Enough Evidence To Support The Decision</u>

10         There was some evidence to support the determination that Haney's commitment

11  offense, escalating criminality including a history of sexual assaults, in-prison misconduct

12  and limited programming made him unsuitable for parole at the 2004 hearing.  These

13  circumstances could be considered alone as well as cumulatively in determining parole

14  suitability.  "Circumstances which taken alone may not firmly establish unsuitability for

15  parole may contribute to a pattern which results in a finding of unsuitability."  15 Cal. Code

16  Regs. § 2402(b).

17         The weight to be attributed to the commitment offense and pre-conviction criminality

18  may fade over time as a predictor of current dangerousness, but the rate at which those facts

19  fade as predictors slows down when the prisoner engages in further misconduct and does not

20  demonstrate rehabilitation.  Here, Haney had accumulated six CDC-115 rule violation

21  reports, four of which had occurred in the two years before the parole hearing, including one

22  that indicated he acted with inappropriate anger when confronted by a correctional officer.

23  Haney also had accumulated ten CDC-128 counselling chronos, including one within a year

24  of the parole hearing.  The volume and recency of these documents evidencing misconduct

25  by Haney indicate that his rehabilitation is still a work in progress and undermine his

26  assertion that he is a model prisoner.  In-prison behavior is something the prisoner has

27  control over, and the fact that he continues to receive disciplinary write-ups indicates that he

28  does not have a very high level of self-control, especially when the misconduct occurs years

1   into the sentence and at a time when he should realize how it will reflect on his parole

2   suitability.    Biggs and Irons did not stand for the proposition that in-prison behavior doesn't

3   matter -- to the contrary, they stand for the proposition that old bad facts can at a certain

4   point be overcome by more recent good facts regarding a prisoner's ability to conform to

5   societal norms.  Haney's continued misconduct in prison plus marginal and outdated

6   programming to better himself (in addition to the murder and his pre-offense criminality)

7   support the BPH's view that he is not suitable for parole and would present a danger to

8   society if released on parole even though he had already been in prison 18 actual years since

9   his 17-to-life sentence was imposed.

10         The Alameda County Superior Court's rejection of Haney's insufficient evidence

11  claim was not contrary to or an unreasonable application of the Superintendent v. Hill some

12  evidence standard.  He is not entitled to the writ on this claim.

13  B.      Biased Decision-Maker Claim

14         Haney makes a rather confused biased decision-maker claim.  He alleges that the BPH

15  and Governor "are effecting an anti-parole policy contrary to the statutory language and

16  parole scheme."  Petition, p. 6.  He alleges that the Governor's failure to reverse or even

17  review any decision denying parole demonstrates a practice "contrary to the stated statutory

18  'shall normally' grant parole policy."  Id.  He also contends that the parole "hearings are

19  fundamentally unfair when the Board is composed of members like Commissioner Fisher

20  who sit in judgment, and who presided over petitioner's hearing."  Id. at 8.

21         A "'fair trial in a fair tribunal is a basic requirement of due process.' . . .  This applies

22  to administrative agencies which adjudicate as well as to courts."  Withrow v. Larkin, 421

23  U.S. 35, 46 (1975) (citations omitted) (combination of investigative and adjudicative

24  functions does not necessarily show a biased decision-maker); see also Morrissey v. Brewer,

25  408 U.S. 480, 489 (1972) (due process requires neutral and detached decision-maker for

26  parole revocation hearing).

27         Haney's claim fails for several reasons.  He has offered absolutely no evidence in

28  support of his assertions.  He has offered no evidence of bias by any of the individual

1 commissioners on the BPH panel.  Indeed, he and his attorney declined to object to the panel

2 at the hearing.  <u>See</u> RT 5.  He also contends that the Governor is biased, but the Governor did

3 not act in his case.  The Governor has the power, but not the duty, to review parole decisions,

4 <u>see</u> Cal. Const. Art. V, § 8, and his decision not to exercise that power does not show bias.

5 Most importantly, California's governorship is not a static institution that continues on one

6 course regardless of the inhabitant of the office.  Haney ignores this and lumps together 4 or

7 perhaps 5 (i.e., Governors Wilson, Davis, Schwarzenegger and perhaps Deukmejian) to

8 argue that there is a no-parole policy.  Each Governor is entitled to separate consideration

9 vis-a-vis his parole policy.  The alleged statement of Governor Davis that he would not

10 parole anyone cannot be attributed to Governor Schwarzenegger unless the latter does

11 something to adopt that policy.  Haney has not provided evidence that Governor

12 Schwarzenegger adopted any anti-parole policy.  And he has presented no evidence of a no-

13 parole policy by the BPH panel under Governor Schwarzenegger's administration that held

14 Haney's subsequent parole hearing in 2004.  Haney is not entitled to the writ on this claim.

15 <center>**CONCLUSION**</center>

16      For the foregoing reasons, the petition is denied on the merits.  The clerk shall close

17 the file.

18      IT IS SO ORDERED.

19 DATED:   April 25, 2007

20                   Marilyn Hall Patel
                  United States District Judge

21

22

23

24

25

26

27

28

<center>14</center>

1

**<u>NOTE</u>**

2

3    1.      The listed circumstances tending to show <u>unsuitability</u> for parole are the nature of the commitment offense, i.e., whether the prisoner committed the offense in "an especially

4    heinous, atrocious or cruel manner;" the prisoner has a previous record of violence; the prisoner has an unstable social history, the prisoner previously engaged in a sadistic sexual

5    offense, the prisoner has a lengthy history of severe mental problems related to the offense; and negative institutional behavior.  15 Cal. Code Regs. § 2402(c).  The listed circumstances

6    tending to show <u>suitability</u> for parole are the absence of a juvenile record, stable social history, signs of remorse, a stressful motivation for the crime, whether the prisoner suffered

7    from battered woman's syndrome, lack of criminal history, the present age reduces the probability of recidivism, the prisoner has made realistic plans for release or developed

8    marketable skills, and positive institutional behavior.  15 Cal. Code Regs. § 2402(d).

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

15